(C.D. 4165)

MARUKAI HAWAII, INC., ET AL. *v.* UNITED STATES

United States Customs Court, Third Division

(Decided January 22, 1971)

*Glad & Tuttle* (*Edward N. Glad* of counsel) for the plaintiffs.
*L. Patrick Gray, III*, Assistant Attorney General (*Bernard J. Babb* and *Velta A. Melmbrencis*, trial attorneys), for the defendant.

Before RICHARDSON and LANDIS, Judges, and ROSENSTEIN, Senior Judge

ROSENSTEIN, Judge: The merchandise covered by the consolidated protests herein consists of packages of alimentary paste, specifically, dried noodles, with enclosed packets of soup base and, in some instances, packets of garnishment. The articles, which were imported in 1967 from Japan, are described on the invoice in entry 105091 (protest 68/32133) as "Quick Cook Saimin Noodle", in entry 103529 (protest 68/10457) as "Dried Japanese Alimentary Paste with Soup", and in entry 20997 (protest 68/52371) as "Japanese Style Alimentary Paste with Soup Stock, Quick Cook Style".[1] They were assessed for duty at 20 per centum ad valorem under item 182.91 of the Tariff

---

[1] The merchandise covered by protest 68/52371 is described therein as "alimentary paste with soup stock" classified at "20%, item 182.91". As no merchandise meeting this description appears on entry 105782, which is listed on the protest, the latter is dismissed with respect to that entry.

Schedules of the United States (TSUS) as "Edible preparations not specially provided for (including prepared meals individually packaged) : * * * Other". Plaintiffs claim that the merchandise is properly dutiable at 14 per centum ad valorem under TSUS item 182.52, which provides for "Soups, soup rolls, soup tablets or cubes, and other soup preparations: * * * Other". Plaintiffs also claim alternatively, that, in the event the court decides "that the alimentary paste and soup stock, although packaged together, should not be treated as an entirety" (brief page 1), the packet of soup stock is dutiable at 14 per centum ad valorem under TSUS item 182.52, as other soup preparations, and the noodles are dutiable as similar alimentary paste at either one or one and one-half cents per pound, depending upon whether or not they contain egg or egg products, under either TSUS item 182.35 or 182.36, which provide as follows:

Macaroni, noodles, vermicelli, and similar alimentary pastes:
182.35 Not containing egg or egg products _____ 1¢ per lb.
182.36 Containing egg or egg products _____ 1.5¢ per lb.

At the trial, the record in *KBS Trading Co., Ltd., American Customs Brokerage Co. et al.* v. *United States*, 62 Cust. Ct. 173, C.D. 3720, 296 F. Supp. 350 (1969), involving similar merchandise, was incorporated. The articles had been classified as edible preparations not specially provided for under TSUS item 182.91, *supra*. Plaintiffs claimed that the noodles were properly classifiable as alimentary paste under item 182.35 or 182.36, *supra*, depending upon whether or not they contained egg or egg products, and that the soup base was dutiable under item 182.52, *supra*.

The pertinent exhibits therein are 1) Exhibit 1, a package labelled "Yokohama Saimin", "Oriental Type Alimentary Paste Product", containing seven ounces of "Yokohama Saimin" and "2 Quick Cook Soup Base" cubes, with printed directions calling for the addition of six cups of water; 2) Exhibit 2, invoiced as "Hoka Hoka Ramen" (Inc. R. 14), a package bearing a stapled label describing the contents as "Japanese Style Alimentary Paste with Soup Base" and "Ramen with Soup", containing a net weight of 2⅘ ounces of "alimentary paste" and "soup base"; 3) Exhibit 3, a cellophane package labelled "Tokusen Chuka Men", "Quick Cook Japanese Style Alimentary Paste", containing 3¾ ounces of noodles and soup base, which, according to printed directions, call for the addition of 2½ cups of water; and 4) Exhibit 5, described on the cellophane package as "Quick Cook Saimin with Soup Base", "Oriental Type Alimentary Paste Product", containing 3 ounces of "Saimin (Yanmar Ramen)"

and ¼ ounce of "Quick Cook Soup Base", which, according to the directions thereon, are prepared with about 2 cups of water.

The court, per Judge Richardson, summarized the testimony of record therein as follows:

> The testimony of plaintiffs' witnesses does not negate use of the imported merchandise as a "meal," and their exhibits do not negate "preparation" of the articles involved prior to importation.
>
> Roy F. Uejio, vice-president and assistant manager of Royal Trading Company, Ltd., testified for the plaintiffs, stating that as part of his duties he had tried out new food products for his company. He prepares and consumes new products or foodstuffs to determine whether or not the company should add it to their line of merchandise. He has eaten the merchandise at bar himself but has not seen it eaten by other people. He further testified he has used these products in preparing a variety of dishes, notably, sukiyaki and fried noodles. In these dishes he did not use both the soup base and the alimentary paste, using merely one of these items and saving the other for future use. Additional ingredients not found in the merchandise at bar must be added to make the sukiyaki, or fried noodles, which Mr. Uejio testified he prepared from the imported products. Mr. Uejio further stated that he recommends the addition of roast pork, seasoned vegetables or onions to make Saimin taste better, although he admitted the products are edible if prepared according to directions without the addition of other ingredients.
>
> Mr. Yoshimi Endo, plaintiffs' second witness, testified he is employed by Shirokiya, Inc. as sales manager. Shirokiya is an importer, wholesaler, and retailer, handling food items, among other things. Among Mr. Endo's duties is the testing of new products to determine whether the company should handle the item. Mr. Endo has used the noodle portion of the imported merchandise to make sukiyaki or fried noodles while saving the soup stock and garnishment for future use. He would add a raw egg to the soup when preparing Saimin from the imported merchandise. * * *
>
> Mr. Hitjiro Matsu, the third witness, is the manager and treasurer of Maruki Hawaii, Inc. He, too, testified that he has used the noodle portion only, preserving the soup base for future use when making fried noodles. He generally added additional ingredients not found in the imported merchandise when preparing Saimin. He, too, admitted, however, that it was edible without the addition of other ingredients, such additions being a matter of personal taste.
>
> Mr. Charles T. Lee, plaintiffs' last witness, is the vice-president and sales manager of K.B.S. Trading Company, Ltd. He, too, is familiar with the imported merchandise, having prepared it for himself as well as having sold it. He has used the noodles alone to make other dishes. He did admit he did not know if purchasing the imported merchandise for use in making dishes other than

Saimin was common. He himself used it because he got it wholesale.

Among defendant's witnesses was Mrs. Marjorie Abel. She is from the nutrition branch of the Hawaii State Health Department. She testified that a prepared meal was "* * * something that has to be put through the major processes of cooking before they are—it is marketed. And the housewife has to put in the minimum amount of time, and, well, it's possible to put in a minimum number of additional ingredients." (R. 75–76.) Mrs. Abel testified that normally a housewife would not purchase exhibits 1, 2, 3, or 5 to make fried noodles, because of the cost. It would be more economical to purchase raw alimentary paste.

Mrs. Muriel Reiko Kamada Miura, the defendant's second witness, is the director of the home economics department of the Honolulu Gas Company. She has a Master's degree in home economics from Columbia University. She testified that she considered the exhibits to be prepared meals even though as a matter of personal taste, most people would add additional ingredients to dress it up when they had them. She made reference to a survey of the Betty Crocker people, who found that most housewives prefer to supply additions to a prepared mix to be made by themselves rather than have the mix in and of itself be complete. The Betty Crocker cake mix was found to sell better when the housewife had to add her own eggs rather than just adding water.

Mr. Tokizo Okahara, defendant's third witness, is president and general manager of Okahara Saimin Factory, Ltd. He testified he considered the imported merchandise to be a prepared meal, although it did not qualify as instant, as it took a few minutes to prepare. In his opinion the addition of other ingredients in the imported merchandise merely makes a more attractive dish but is not necessary.

Mrs. Juliet F. Tong, a housewife employed part-time as a public health nutritionist by the Department of Health of the State of Hawaii, testified that she considered the exhibit 3 to be a bad meal because it is only carbohydrate. As a nutritionist she would have to add some meat and some vegetables or fruit, but her daughter, like most people in Hawaii, would just eat this (meaning the merchandise at bar) for a meal.

Mr. Ronald Sakamoto, a commodity specialist with the United States Customs Service, testified that he classified the merchandise at bar and has eaten similar merchandise in his own home as an entire meal without having added any other ingredients. At Mr. Vance's request he ate some of this imported merchandise just as it came from the box, and other portions he soaked in a bowl of cold water to soften before eating. In both instances he found it to be edible.

Mr. Wilfred Y. Ogawa, a commodity specialist of the United States Customs Service, who does not classify merchandise in the food line, testified he has had experience with the merchan-

dise at bar by having eaten it and similar merchandise in his own home. He, too, considered it a meal to which nothing else had to be added.

Stating that the case involved the determination of the common meaning of the term "prepared meal", which appears for the first time in the Tariff Schedules of the United States, the court observed:

Plaintiffs' own witnesses have admitted the use of the merchandise at bar as a meal. Further, an examination of the exhibits reveals the merchandise is packaged and sold as a unit designed to be made into a single dish. See *Coro, Inc.* v. *United States*, 41 CCPA 215, C.A.D. 554, *United States* v. *The Halle Bros. Co.*, 20 CCPA 219, T.D. 45995. * * *

The court overruled the protest, holding:

On the record, plaintiffs failed to overcome the presumption of correctness attached to the collector's classification. The exhibits themselves appear to be prepared meals individually packaged. None of plaintiffs' witnesses denied that the imported merchandise was sold as prepared Saimin or Ramen. Plaintiffs' witnesses testified to other uses which could be made of this merchandise, but the English language directions on the merchandise itself gave no hint of such other use. And none of defendant's witnesses would agree to the suitability of said merchandise for other dishes in view of the expense.

In a concurring opinion, Judge Landis commented:

While this case was tried and briefed on the issue of whether the imported merchandise is a "prepared meal", I am not at all sure that plaintiffs could have overturned the collector's classification on a mere showing that it was not a "prepared meal". Assuming that it was not a "prepared meal", it would still be presumptively an "edible preparation not specially provided for" i.e. more than just alimentary paste without eggs, or soup preparations, as claimed.

In short, I am of the opinion that plaintiffs had a greater burden than just to show the imported merchandise was not a "prepared meal".

In the pending case, plaintiffs raise a new issue, namely, that the merchandise is classifiable as an entirety under item 182.52. Their alternative claim that the noodles and soup base are separately classifiable under item 182.35 or 182.36, and item 182.52, respectively (which was raised and disposed of in the incorporated case), is not strongly pressed by plaintiffs, who state (brief, page 20):

Applying the foregoing rules, the facts herein reveal as stated by the court in the *K.B.S. Trading Co., Ltd.* case, *supra*, that:

1. The exhibits reveal that the merchandise is packaged and sold as a unit.

2. The merchandise is designed to be made into a single dish.

Without summarizing the testimony herein on this point, we think it suffices to say that the record fully supports the foregoing statements; and we agree with plaintiffs' conclusion, as does defendant, that the subject merchandise, which is a new and distinct article of commerce formed by joining the alimentary paste and the soup stock, in an entirety for tariff purposes. See *Lafayette Radio Electronics Corp.* v. *United States*, 57 CCPA 62, C.A.D. 977 (1970); *Miniature Fashions, Inc.* v. *United States*, 54 CCPA 11, C.A.D. 894 (1966).

Accordingly, we find and hold, as did the court in *KBS Trading*, that the noodles and soup base are not separately classifiable and we overrule the protests with respect to such claim.

There remains the question whether plaintiffs have overcome the district director's presumptively correct classification of the merchandise under item 182.91, and have established that it is more specifically provided for under item 182.52 as "other soup preparations."

In support of this claim, plaintiffs called Hidejiro Matsu, Roy F. Uejio and Yoshimi Endo, who had testified in the *KBS Trading Co.* case, *supra*, and six additional witnesses; defendant called six witnesses.

Matsu, Uejio and Endo [2] testified that, if exhibits 1, 2, 3, and 5 in the incorporated case were prepared according to directions, the result would be "noodle soup" or "noodles and soup" [Matsu, Endo], "saimin" or "soup with noodles" [Uejio, who also stated that if the soup base were used without the noodles it would be called "saimin soup"]; that the product is served in a saimin, or soup, bowl; that saimin, which has the same meaning as "ramen", is the "noodle in the soup" [Matsu]; and that the prepared saimin would contain approximately 40 percent or less of noodles [Endo].

Plaintiffs' remaining witnesses, all of whom are associated with companies engaged in the importation of oriental foods, including the kind involved in the incorporated case, testified that they are familiar with the involved merchandise; that it is served in a bowl; that "saimin" is also called "ramen"; and that, if the directions for preparing the incorporated exhibits were followed, the resultant product would be a "snack" [Yosh Fukushima], "starch and soup" or "noodles and soup" [Juro Hosoda, who agreed that there were more noodles in ramen than in noodle soup], "noodle soup" [Kaz Kariya, Susumu E. Kazahaya, and Noritoshi Kanai], and "ramen" which is a "sort of a soup noodle" [Akio Murata]. Meat, poultry or vegetables are frequently added to this dish.

---

[2] Exhibit 5 is similar to the "Quick Cook Saimin Noodle", the subject of protest 68/32133 [Matsu]; exhibits 1, 2, and 3 are the same as the "Dried Japanese Alimentary Paste with Soup" in protest 68/10457 [Uejio]; and exhibits 2 and 5 are similar to the "Japanese Style Alimentary Paste with Soup Stock" in protest 68/52371 [Endo].

Defendant's witnesses, two of whom are housewives and the others, employees of the Bureau of Customs, testified that they were familiar with and had prepared and eaten food of the same type as the incorporated exhibits. There was testimony that the prepared product was known as "noodles" [Brenda Min, who stated that the solids outweighed the liquid in volume; Agnes Yamamoto, who considered the product to be a meal, a substitute for rice or bread; Jennie D. Luke, who described it as a "snack"]. Another witness described the product as "noodles with soup base" [George H. Hall], and the last witness [Hanako Uyeki], who never prepared the noodles without the soup base, usually did not drink the "starchy" liquid.

Plaintiffs contend, citing *Crosse & Blackwell Co.* v. *United States*, 36 CCPA 33, C.A.D. 393 (1948), that the provision for "other soup preparations" is one without limitations and, therefore, includes all forms of the article. It is a well established principle that, as expressed in *Nootka Packing Co. et al.* v. *United States*, 22 CCPA 464, 470, T.D. 47464 (1935), "an *eo nomine* statutory designation of an article, without limitations or a shown contrary legislative intent, judicial decision, or administrative practice to the contrary, and without proof of commercial designation, will include all forms of said article." This rule of construction, however, has as a prerequisite the showing that the particular merchandise is so named. It must, in other words, be recognizable as a form of the named article. *Mitsugi Higashi* v. *United States*, 64 Cust. Ct. 25, C.D. 3954 (1970).

Thus, it was part of plaintiffs' burden to establish that the imported merchandise is a soup preparation within the meaning of the tariff provision.

Unless shown to have a differing commercial description, tariff terms are to be accorded their common meaning. *Hummel Chemical Co.* v. *United States*, 29 CCPA 178, C.A.D. 189 (1941). The issue of common meaning is a matter of law for the court which may consult dictionary definitions and other lexicographical authorities. *United States* v. *Mercantil Distribuidora et al.*, 43 CCPA 111, C.A.D. 617 (1956).

Following are some definitions of "soup" which bear on its common meaning:

> 1. Liquid food made by boiling meat or vegetables, or both, in water, with seasoning, and sometimes thickening: distinguished from *broth*, which is usually strained or free from the solid ingredients that soup retains. Soup is said to be eaten and not *drunk*.
> Soups are either bisk, bouillon, claire, consommé, garbure, or purée, and are often named from their principal ingredient, as, beef soup, pea s., tomato s., vermicelli s., etc. * * *

*Funk & Wagnalls New Standard Dictionary*, 1956

1. a The well-seasoned broth of meat or vegetables or both, served clear, with pieces of the original food, or with additions such as barley or noodles; also, a thin purée. * * *

*Websters' New International Dictionary,* second edition, 1953

A liquid food made from meat, fish, or vegetables, with various added ingredients, by boiling; broth; * * *.

*The New Century Dictionary,* 1927

A liquid food, generally having a meat stock as its basis and flavored with vegetables, seasonings, etc: * * *.

*The Winston Dictionary,* Encyclopedic Edition, 1957

Soup, a liquid food consisting usually of stock (water in which meat or vegetables have been boiled) with or without other ingredients. Soups are also made without stock. * * *

*The Encyclopaedia Britannica,* 1951

According to the foregoing definitions, soup is, essentially, a liquid food which may contain pieces of solid food such as meat, pasta, or vegetables.

We find, on the testimony and exhibits herein, that the articles before us do not comport with the common understanding of soup preparations. When prepared as described, the resulting product is not noodle soup, as plaintiffs claim, but a flavored noodle preparation, commonly known as "saimin" or "ramen". The fact that this type of food is served in a soup or saimin bowl does not make it a soup any more than chili, a well known dish prepared from beans and spices, often with the addition of meat, is a soup because it is usually served in a bowl and eaten with a spoon.

Moreover, there is no evidence of record that the imported merchandise is bought, sold, or offered to the consuming public as a soup preparation.[3] The printing on the packaged exhibits, as noted, *supra,* describes the contents variously as "Saimin with Soup Base", "Japanese Style Alimentary Paste", "Oriental Type Alimentary Paste Product" or, as the label affixed to exhibit 2 states, "Japanese Style Alimentary Paste with Soup Base". Obviously, what is being offered is an oriental style noodle dish, not a noodle soup preparation.

Plaintiffs have in no wise controverted the finding in the incorporated case that "the exhibits themselves appear to be prepared meals individually packaged." The principle of *stare decisis* requires a like determination herein.

The protests are overruled. Judgment will issue accordingly.

---

[3] The fact that the menu (exhibit 7) from "Harry's" restaurant in Gardena, California lists "Saimin" and "Saimin Special" under "Soup", and that "Bowl of Saimin" or "Bowl Saimin" is listed under "Appetizers" on two other restaurant menus (coll. exhibit 6) does not persuade us otherwise.